## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 22-00236-JB-3 |
| | ) | |
| DYLAN MICHAEL MILLER | ) | |

### PLEA AGREEMENT

The defendant, **DYLAN MICHAEL MILLER**, represented by his counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.    The defendant understands his rights as follows:

   a.    To be represented by an attorney;

   b.    To plead not guilty;

   c.    To have a trial by an impartial jury;

   d.    To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense; and

   e.    To not be compelled to incriminate himself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2.    The defendant waives rights b through e, listed above, and pleads guilty to Counts One and Five of the Indictment, charging violations of Title 21, United States Code, Section 846, Conspiracy to Possess with Intent to Distribute Methamphetamine (Actual), and Title 18, United States Code,

1

Section 924(c)(1)(A)(i), Possession of a Firearm in Furtherance of a Drug Trafficking Crime, respectively.

3.    The defendant understands that the statements he makes under oath in the plea of guilty must be completely truthful and that he can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4.    The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5.    The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing that will follow.

6.    The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charges that have been brought against him. The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offenses.

7.    The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charges beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charges. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

2

8.    The defendant recognizes that pleading guilty may have consequences with respect to immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offenses to which he is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

9.    A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual Resume is true and correct. Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

10.    This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement. There have been no promises from anyone as to the particular sentence that the Court will impose. The defendant is pleading guilty because he is guilty.

11.    The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation

3

or prosecution of this matter. This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## **PENALTY**

12.    The maximum penalty the Court could impose as to Count One of the Indictment is:

    a.    Life imprisonment, with a mandatory minimum term of ten (10) years' imprisonment;

    b.    A fine not to exceed $10,000,000;

    c.    A term of supervised release of life, with a mandatory minimum term of supervised release of five (5) years, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

    d.    A mandatory special assessment of $100.00; and

    e.    Such restitution as may be ordered by the Court.

13.    The maximum penalty the Court could impose as to Count Five of the Indictment is:

    a.    Life imprisonment, with a mandatory minimum consecutive term of five (5) years' imprisonment;

    b.    A fine not to exceed $250,000;

    c.    A term of supervised release of five (5) years, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

    d.    A mandatory special assessment of $100.00; and

e.       Such restitution as may be ordered by the Court.

## SENTENCING

14.    The Court will impose the sentence in this case. The United States Sentencing Guidelines are advisory and do not bind the Court. The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that he will not be allowed to withdraw his guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

15.    The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

16.    The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

17.    Both the defendant and the United States are free to allocute fully at the time of sentencing.

18. The defendant agrees to tender $200.00 to the U.S. District Court Clerk in satisfaction of the mandatory special assessment in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## FORFEITURE

19. The defendant agrees to confess the forfeiture to the United States of all properties that represent proceeds of his criminal activities or that facilitated any aspect of these illegal activities. The property to be forfeited includes, but is not limited to, the following:

    a.    One (1) Sig Sauer, model SIGM400, 5.56mm rifle, serial number 20L057974;

    b.    One (1) Smith & Wesson, model M&P-15, 5.56mm rifle, serial number TR39728;

    c.    One (1) Anderson Manufacturing, model AM-15, multi caliber rifle, serial number 20071493;

    d.    One (1) Glock, model 22, .40-caliber pistol, serial number PDK530;

    e.    One (1) Smith & Wesson, model 37 Airweight, .38 Special caliber revolver, serial number J242360;

    f.    One (1) Glock, model 19Gen4, 9mm pistol, serial number PYX303;

    g.    One (1) Yildiz Silah Sanayi, model YP12SC, 12-gauge shotgun, serial number P20283;

h.   One (1) Kel-Tec, model PMR 30, .22-caliber pistol, serial number WW6V99;

i.   One (1) Heckler & Koch, model P30, 9mm pistol, serial number 129-077779;

j.   One (1) SCCY, model CPX-1, 9mm pistol, serial number C032038;

k.   One (1) Rossi, model M69, .32-caliber revolver, serial number C247112;

l.   Five (5) rounds of Blazer .45-caliber ammunition;

m.   One (1) round of Super Vel .38 SPL ammunition;

n.   Three (3) rounds of GFL .357 mag ammunition;

o.   Five (5) rounds of Winchester .38 SPL ammunition;

p.   Ninety-six (96) rounds of Tulammo .223-caliber ammunition;

q.   Eight (8) rounds of Smith & Wesson .40-caliber ammunition;

r.   Twenty (20) rounds of WNA 9mm ammunition;

s.   Forty-one (41) rounds of 9mm Luger ammunition;

t.   Twenty (20) rounds of FC 9mm Luger ammunition;

u.   Seven (7) rounds of S&B 9mm ammunition; and

v.   Five (5) rounds of S&B .32-caliber ammunition.

## FINANCIAL OBLIGATIONS

20.   The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant

exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

21.     The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss any remaining charges against the defendant once sentence is imposed in this case. This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

22.     The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court.

## APPLICATION OF USSG § 5K1.1 AND/OR FED. R. CRIM. P. 35

23.     The defendant understands and agrees that he has no right to cooperate, and that the decision whether to allow him to cooperate is reserved solely to the United States in the exercise of its discretion. If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

   a.     The defendant shall fully, completely, and truthfully respond to all questions put to him by law enforcement authorities regarding the underlying facts of the offenses with which he is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which he has information or knowledge.

8

b.    The defendant acknowledges that he understands that he shall provide truthful and complete information regarding any offense about which he has knowledge or information regardless of whether law enforcement authorities question him specifically about any such offense. This provision requires the defendant to divulge all information available to him even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c.    The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which his cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance he shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.    If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at

9

sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e.    The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.    The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g.    If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable. The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The

defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance. The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h.    The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by him from his illegal activities or obtained by others associated with him or of which he has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

11

(1)  permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Indictment; and

(2)  permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement. The United States will not be limited, in any respect, in the use it may make against the defendant of any information provided by the defendant during his breached cooperation. Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

i.  Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during his cooperation. The defendant acknowledges and agrees that the information that he discloses to the United States pursuant to this agreement may be used against him in any such prosecution.

j.  The United States and the defendant agree that the defendant will continue his cooperation even after he is sentenced in the instant matter. His failure

12

to continue his cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement. Under these circumstances, the defendant expressly waives any rights he may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

24.    As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge his guilty plea, conviction, or sentence in any district court or appellate court proceedings.

   a.    **EXCEPTIONS.** The defendant reserves the right to timely file a direct appeal challenging:

   (1)    any sentence imposed in excess of the statutory maximum;

   (2)    any sentence which constitutes an upward departure or variance from the advisory guideline range.

The defendant also reserves the right to claim ineffective assistance of counsel in a direct appeal or § 2255 motion.

13

25.    If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

26.    The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

27.    If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

28.    The defendant understands that if he breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant. In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

29.    In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

14

## ENTIRETY OF AGREEMENT

30.    This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: February 2, 2023

Justin D. Roller
Assistant United States Attorney

Date: 2-2-2023

Kasee S. Heisterhagen
Assistant United States Attorney
Deputy Chief, Criminal Division

15

I have consulted with my counsel and fully understand all my rights with respect to the offenses charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date: 2/23/23

Dylan Michael Miller
Defendant

I am the attorney for the defendant. I have fully explained his rights to him with respect to the offenses charged in the Indictment in this matter. I have carefully reviewed every part of this Plea Agreement with him. To my knowledge, his decision to enter into this agreement is an informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, his decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: 2/27/23

for    Colin Fitzpatrick
Attorney for Defendant

16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    CRIMINAL NO. 22-00236-JB-3 |
| | ) |
| DYLAN MICHAEL MILLER | ) |

## FACTUAL RESUME

The defendant, **DYLAN MICHAEL MILLER** ("MILLER"), admits the allegations of

Counts One and Five of the Indictment.

## ELEMENTS OF THE OFFENSE

**MILLER** understands that in order to prove a violation of Title 21, United States Code,

Section 846, as charged in Count One of the Indictment, the United States must prove:

First:      Two or more people in some way agreed to try to accomplish a shared and unlawful plan, the object of which was to possess with the intent to distribute methamphetamine (actual); and

Second:      The defendant knew the unlawful purpose of the plan and willfully joined in it.

**MILLER** further understands that in order to prove a violation of Title 18, United States

Code, Section 924(c)(1)(A)(i), as charged in Count Five of the Indictment, the United States must

prove:

First:      The defendant committed the drug-trafficking crime charged in Count One of the Indictment; and

Second:      The defendant knowingly possessed a firearm in furtherance of that crime, as charged in the Indictment.

1

## **OFFENSE CONDUCT**

**MILLER** admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **MILLER's** plea of guilty. The statement of facts does not contain each and every fact known to **MILLER** and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement. All dates, times, amounts, and locations referenced below are approximations.

### **Overview**

From at least August 2020 through March 8, 2021, in the Southern District of Alabama and elsewhere, **MILLER** knowingly and intentionally conspired with Grayson Zachary Eagan ("Eagan") and Lakin Amanda Wright ("Wright")—his codefendants named in Count One of the Indictment (collectively, the "Defendants")—and with other persons, both known and unknown to the Grand Jury, to possess with intent to distribute methamphetamine (actual), a schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1). **MILLER** admits that he knew the unlawful purpose of the plan, the object of which was to possess with the intent to distribute methamphetamine (actual), and willfully joined in it. **MILLER** further admits that the amount of methamphetamine (actual) attributable to him exceeded 50 grams, rendering him subject to the penalty provisions of 21 U.S.C. § 841(b)(1)(A).

**MILLER** further admits that on March 8, 2021, in the Southern District of Alabama and elsewhere, he knowingly possessed the firearms referenced in Count Five of the Indictment, in paragraph 19(a)–(k) of this Plea Agreement, and in this Factual Resume, in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, namely,

2

Conspiracy to Possess with Intent to Distribute Methamphetamine (Actual) in violation of 21 U.S.C. § 846, as alleged in Count One of the Indictment and to which he is pleading guilty.

**Mar. 8, 2021: high-speed chase/arrest of MILLER & codefendants**

At 1:43 am on March 8, 2021, a Baldwin County Sheriff's Office ("BCSO") deputy was sitting stationary in his marked BCSO patrol unit on U.S. Highway 90, east of County Road 87, when he observed a black BMW 335i sedan bearing a Florida disabled veteran tag "DV" (the "BMW") pass by him westbound on Highway 90. The BMW had a bright light emitting from one of its taillights, in violation of Ala. Code § 32-5-242(g) (improper light color). The deputy pulled onto the roadway and attempted to catch up to the BMW on Highway 90 but eventually lost sight of it. As the deputy approached the intersection of Highway 90 and County Road 87, he observed the BMW's white taillights half a mile ahead and had difficulty catching up to the vehicle, which was traveling at a high rate of speed. The BMW suddenly slowed and turned left toward Dyess Lane, never actually making the turn and driving on the wrong side of the road for a short distance before returning to the proper travel lane. At that point, the deputy activated his emergency lights and sirens to attempt to stop the BMW, which immediately accelerated away and led BCSO deputies on a hazardous, 20-minute high-speed chase.

The pursuit carried on at speeds in excess of 100 miles per hour through various lighted intersections and stop signs. BCSO deputies deployed a spike strip near U.S. Highway 91 and County Road 91, which successfully deflated the BMW's front left tire. The BMW did not stop, however, avoiding a second spike strip near U.S. Highway 98 and County Road 93. As the pursuit continued, the BMW lost its front left tire, leaving only the rim of the wheel on the vehicle. The BMW pressed on at speeds between 80 and 100 mph on U.S. Highway 98, crossing into Florida. Upon reaching Gulf Beach Highway, deputies with the Escambia County, Florida Sheriff's Office

3

("ECSO") assisted in the pursuit.

The pursuit continued into a residential area, approaching a "T" intersection at Halsey Drive and Reed Road in Pensacola, where the BMW spun out and lost control. At that point, a BCSO deputy obtained a clear view of the BMW and its occupants—the adult male driver (Eagan), an adult male front-seat passenger (**MILLER**), and an adult female back-seat passenger (Wright). The deputy noticed that the rear-passenger window of the BMW was down and believed that evidence was being discarded from the car. As reflected on in-car dash-camera video, a black bookbag was thrown from the open window of the BMW and rolled into a driveway located on Reed Road.

The pursuit continued down Reed Road until Eagan made a left onto Rue Max Street, spinning out and getting stuck in a driveway at the intersection of Rue Max Street and Donald Drive. Eagan and **MILLER** immediately attempted to get out of the BMW and acted like they were going to flee on foot. Deputies got out of their patrol vehicles and drew their service weapons, shouting loud commands at Eagan and Miller to get on the ground. Both complied and dropped to their knees. The female passenger, Wright, remained in the backseat of the BMW until deputies ordered her to step out. Lying next to Eagan, deputies found an AR-15-style rifle with an arm brace, which was loaded with a round in the chamber. Deputies took the Defendants into custody without further incident. Eagan had $3,058 in cash on his person.

**Search & recovery of drugs & guns from the BMW**

Deputies saw multiple firearms lying in plain view in the BMW, as well as a set of digital scales covered in crystal-like residue lying in plain view on the front passenger floorboard. Deputies conducted a probable-cause search of the BMW and recovered, among other things, seven firearms (three handguns, including a .40-caliber Glock pistol that had previously been

reported stolen to ECSO, three AR-15-style rifles, and a 12-gauge shotgun), numerous rounds of ammunition (identified in paragraph 19(*l*)–(v) of this Plea Agreement) and magazines (including a drum magazine), a tactical body armor vest, and two stolen Florida license plates. Deputies found the stolen Glock between the driver's seat and the center console of the BMW; the other two handguns were in the rear floorboard area (a revolver lying loose and another Glock pistol equipped with a suspected machinegun-conversion device (*i.e.*, a "Glock switch") in a case). The shotgun was on the rear seat, and the other two AR-15-style rifles were in the trunk. At the time of the incident on March 8, 2021, and as detailed further below, **MILLER** had previously been convicted of several felony offenses in the Circuit Court of Escambia County, Florida, and thus federal law prohibited him from possessing firearms.

The firearms recovered from the BMW (and locations) are listed below:

1.    a Sig Sauer, model SIGM400, 5.56mm rifle, serial number 20L057974 (trunk);

2.    a Smith & Wesson, model M&P-15, 5.56mm rifle, serial number TR39728 (trunk);

3.    an Anderson Manufacturing, model AM-15, multi caliber rifle, serial number 20071493 (on the ground next to Eagan);

4.    a Glock, model 22, .40-caliber pistol, serial number PDK530 (between driver's seat and center console – reported stolen in November 2020);

5.    a Smith & Wesson, model 37 Airweight, .38 Special caliber revolver, serial number J242360 (rear floorboard);

6.    a Glock, model 19Gen4, 9mm pistol, serial number PYX303 (rear floorboard in a case), equipped with a suspected machinegun-conversion device; and

7.    a Yildiz Silah Sanayi, model YP12SC, 12-gauge shotgun, serial number P20283 (rear seat).

The above-referenced firearms found in the BMW (1) are "firearms" as defined in 18 U.S.C. § 921(a)(3); and (2) were manufactured outside of Alabama, and therefore traveled in and affected interstate and/or foreign commerce.

Deputies also recovered drugs and other relevant items from the BMW. On the passenger's seat where **MILLER** had been sitting, deputies found a personal use amount of marijuana, 15 unopened packages of suboxone, and two containers of THC gummies. On the rear seat, where Wright had been sitting, deputies located a brown bag containing female items and a wallet. Inside the wallet, deputies found a bag containing a clear crystal substance that field tested positive for methamphetamine. Inside the trunk of the BMW near where deputies recovered two of the AR-15-style rifles, deputies found a vacuum-sealed bag that had been cut in half and contained methamphetamine residue. Deputies also found a small amount of marijuana in Wright's pocket. Deputies seized several cell phones from the BMW and obtained warrants to search their contents from the Circuit Court of Baldwin County, Alabama. Deputies also found $1,003 in cash inside the BMW.

**The Defendants' on-scene statements**

Deputies advised each of the Defendants of their *Miranda* rights and interviewed each of them separately on-scene, as reflected on body-worn camera videos. Deputies started with Wright, who stated that she knew Eagan through **MILLER** and that the two of them had picked her up that night from a hotel on Highway 29 in Pensacola. Wright stated that when deputies pulled behind them in the BMW, Eagan and **MILLER** began to panic, exclaiming, "Oh fuck, oh fuck, oh fuck." Wright denied knowledge of any of the firearms located in plain view in the BMW until the car made a sharp turn, at which time she claimed that the 12-gauge shotgun hit her leg. Wright disclaimed any knowledge of the drugs in the BMW other than the marijuana found on her person,

stating that she did not think she had any methamphetamine but admitting to being a methamphetamine user.

Deputies spoke with **MILLER** next, whose statements contradicted Wright's. **MILLER** stated that he had met Eagan through Wright, and that Eagan and Wright were in a relationship with each other. **MILLER** claimed that Eagan would not let him out of the BMW and had threatened to kill him. **MILLER** further claimed that he had not seen any of the guns in the BMW and had just gotten picked up, despite the fact that several of the guns were located lying in plain view in the cabin of the car. **MILLER** claimed that he tried to get Eagan to stop the car and did not want anything to do with running from the deputies, notwithstanding that he had initially started to run after exiting the BMW.

Deputies attempted to interview Eagan but were not able to do so because Eagan claimed he was having a panic attack. While seated in a patrol unit, and as captured on in-car dash-camera video, Eagan made statements not in response to any questioning as he observed deputies searching the BMW. For example, at one point, Eagan stated, "Did that bitch not throw my motherfucking drugs out?" Minutes later, Eagan stated, "Did you get my bookbag?"

**Recovery of additional drugs, guns, & cash from the black bookbag**

At 8:00 am on March 8, 2021, hours after deputies' pursuit and arrest of the Defendants, a resident of Reed Road called ECSO to report having found the black bookbag in the driveway. The resident stated that when he looked in his front lawn that morning, he saw the black bookbag (a designer "Coach" bag), which did not belong to him. The resident looked in the bag and saw a gun, so he contacted ECSO.

Inside the bookbag, deputies found, among other things, the following items:

1.    a Kel-Tec, model PMR 30, .22-caliber pistol, serial number WW6V99;

7

2.      a Heckler & Koch, model P30, 9mm pistol, serial number 129-077779;

3.      an SCCY, model CPX-1, 9mm pistol, serial number C032038;

4.      a Rossi, model M69, .32-caliber revolver, serial number C247112;

5.      several items of drug paraphernalia (including baggies, spoons, a hypodermic needle, and Narcan);

6.      1,040 grams of 100% pure methamphetamine (as confirmed by toxicology analysis completed by the Drug Enforcement Administration ("DEA") in May 2022);

7.      38.8 grams of heroin (as confirmed by DEA toxicology analysis completed in May 2022); and

8.      $74,065 in banded-up cash.

The above-referenced firearms found in the bookbag (1) are "firearms" as defined in 18 U.S.C. § 921(a)(3); and (2) were manufactured outside of Alabama, and therefore traveled in and affected interstate and/or foreign commerce.

**June 2021: post-*Miranda* interview of MILLER**

On June 3, 2021, federal agents interviewed **MILLER** at the Escambia County Correction Center following his arrest on state trafficking charges relating to the above-referenced incident. Agents advised **MILLER** of his *Miranda* rights and he completed a *Miranda* waiver form, agreeing to speak with agents. Contrary to his prior statements on the night of his arrest, **MILLER** stated that he had introduced Wright, whom he had previously dated, to Eagan. **MILLER** said he had known Eagan for about six or seven months, and that his first face-to-face encounter with Eagan was during a drug deal for marijuana. **MILLER** stated that Eagan was a source of supply for ice methamphetamine, heroin, fentanyl, and marijuana, and that he had seen Eagan with between half a pound to a pound of ice methamphetamine and a Tupperware container of heroin.

8

**MILLER** admitted that he had sold ounces of ice methamphetamine for Eagan in the past, which he up-charged to make a profit. **MILLER** further stated that he had seen Eagan with the black Coach bookbag described above. **MILLER** said the bookbag was in the backseat of the BMW during the pursuit on March 8, 2021, and that he had previously seen it in Eagan's vehicle. **MILLER** said he had seen Eagan remove drug paraphernalia from the bookbag before.

On the evening of the pursuit on March 8, 2021, **MILLER** said that Eagan and Wright were in the area of **MILLER's** house to sell heroin to unknown females. **MILLER** decided to join them. Once in the BMW, **MILLER** stated that Eagan and Wright were fighting, which caused Eagan to drive erratically. At one point, at a Circle K gas station, **MILLER** and Wright switched seats. Upon sitting in the front passenger seat, **MILLER** stated that he saw the Heckler & Koch 9mm pistol on the floorboard, which he knew belonged to Eagan and had seen Eagan shoot in the past. The BMW left the gas station, at which time **MILLER** believed that the Defendants were heading to Elberta, Alabama. Eagan was speeding when he saw a marked BCSO unit parked off the side of the road. Eagan accelerated to get away from the deputy and attempted to use the BMW's GPS to route back to Pensacola. At that time, **MILLER** stated that Eagan told him to throw the Heckler & Koch pistol located on the floorboard out the window, but **MILLER** refused and gave the gun to Eagan. **MILLER** stated that during the pursuit, Wright's rear passenger window was down and he believed that she was throwing items from the car. **MILLER** said the car contained several bookbags and luggage because Eagan and Wright were living out of it. When asked if any of his fingerprints or DNA would be found on any items in the car, **MILLER** admitted that the Kel-Tec pistol (found in the black bookbag) belonged to him. **MILLER** stated that he had purchased the pistol for $150 from an individual. **MILLER** added that the shotgun and one of the AR-15-style rifles found in the BMW had been purchased from the same individual.

9

**MILLER's Facebook content**

Agents searched **MILLER's** Facebook account pursuant to a federal search warrant. **MILLER's** account contained numerous messages detailing his knowing and willful participation the charged conspiracy to distribute methamphetamine and other drugs during relevant times charged in the Indictment. Those messages included messages that **MILLER** exchanged with Wright and others regarding the sale of methamphetamine and heroin, prices for those drugs, and receipt of payments for the sale of those drugs. Additionally, **MILLER's** Facebook messages demonstrate that in March 2021, he arranged for the purchase of several of the firearms that deputies recovered from the BMW and the black bookbag—including the Kel-Tec pistol, the SCCY pistol, the Rossi revolver, the Yildiz Silah Sanayi shotgun, the Sig Sauer rifle, and the Smith & Wesson rifle.

**MILLER's prior felony convictions**

At the time he knowingly possessed the above-referenced firearms, **MILLER** knew he had previously been convicted of felony crimes, namely, (i) Possession of a Controlled Substance without a Prescription on August 11, 2020, in the Circuit Court in and for Escambia County, Florida, case number 2020CF001907A; (ii) Possession of a Controlled Substance on August 16, 2017, in the Circuit Court in and for Escambia County, Florida, case number 2017CF001601A; and (iii) Grand Theft Auto on December 28, 2016, in the Circuit Court in and for Escambia County, Florida, case number 2016CF002112A.

**Sentencing agreements**

**MILLER** agrees to forfeit to the United States any and all interest he has in (1) the firearms referenced in paragraph 19(a)–(k) of this Plea Agreement; and (2) the ammunition referenced in

10

paragraph 19(*l*)–(v) of this Plea Agreement, which he admits are forfeitable as properties that represent proceeds of his criminal activities or that facilitated any aspect of these illegal activities.

For sentencing purposes, the parties agree that **MILLER** is responsible for at least 1,040 grams of methamphetamine (actual) and 38.8 grams of heroin as part of the conspiracy to which he is pleading guilty. *See* U.S.S.G. § 2D1.1(a)(5) & (c)(3).

AGREED TO AND SIGNED.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: February 2, 2023

Justin D. Roller
Assistant United States Attorney

Date: 2-2-2023

Kasee S. Heisterhagen
Assistant United States Attorney
Deputy Chief, Criminal Division

Date: 2/23/23

Dylan Michael Miller
Defendant

Date: 2/23/23

for Colin Fitzpatrick
Attorney for Defendant

11